123 T.C. No. 9

UNITED STATES TAX COURT

TRANSPORT LABOR CONTRACT/LEASING, INC. & SUBSIDIARIES, Petitioner
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1188-01.                     Filed August 9, 2004.

        P's wholly owned subsidiary S made payments to
certain truck drivers whom S leased to certain trucking
companies.  S intended such payments to cover food and
beverages expenses that such truck drivers paid while
traveling away from home.

        Held, the parties' respective positions as to the
import of Beech Trucking Co. v. Commissioner, 118 T.C.
428 (2002), rejected.  Held, further, on the facts
presented, S is the common law employer of the truck
drivers to whom it made the payments at issue.  Held,
further, the limitation imposed by sec. 274(n)(1)
applies to those payments.

        Michael I. Saltzman, Kathleen Pakenham, and Todd C. Simmens,
for petitioner.

Jack Forsberg, Gary R. Shuler, Jr., and Eric Johnson, for respondent.


CHIECHI, Judge:  Respondent determined the following deficiencies in petitioner's Federal income tax (tax):

| Taxable Year Ended Aug. 31 | Deficiency |
|---|---|
| 1993 | $330,320 |
| 1994 | 28,346 |
| 1995 | 1,694,076 |
| 1996 | 1,978,282 |

In an amendment to answer, respondent alleged increases of $460,999, $473,305, and $286,223 in the deficiencies in tax for petitioner's taxable years ended August 31, 1994, August 31, 1995, and August 31, 1996, respectively, as a result of respondent's disallowance of a net operating loss (NOL) carryback to each such taxable year that petitioner claimed from its taxable year ended August 31, 1997.[1]

The issue remaining for decision[2] is whether the limitation

---

[1]We shall refer to petitioner's taxable years ended Aug. 31, 1993, Aug. 31, 1994, Aug. 31, 1995, Aug. 31, 1996, and Aug. 31, 1997, as taxable years 1993, 1994, 1995, 1996, and 1997, respectively.

[2]Our resolution of the issue remaining for decision will resolve the issues that respondent raised in the amendment to answer relating to the disallowance of an NOL carryback that petitioner claimed from its taxable year 1997.

imposed by section 274(n)(1)[3] applies to the amounts (per diem amounts) that petitioner's wholly owned subsidiary Transport Leasing/Contract, Inc. (TLC), paid during each of the taxable years at issue to certain truck drivers (truck drivers) in order to cover the amounts that they spent for food and beverages.[4] We hold that it does.

FINDINGS OF FACT[5]

Most of the facts have been stipulated and are so found.

Petitioner had its principal office in Arden Hills, Minnesota, at the time it filed the petition in this case.

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. As in effect for taxable years that began after Dec. 31, 1993, sec. 274(n)(1) limits a deduction for food or beverages to 50 percent of the amount otherwise allowable (50-percent limitation). Prior to its amendment by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13209(a), 107 Stat. 469 (OBRA 1993), sec. 274(n)(1) limited a deduction for food or beverages to 80 percent of the amount otherwise allowable (80-percent limitation). In the instant case, the 80-percent limitation applies to taxable years ended Aug. 31, 1993, and Aug. 31, 1994, and the 50-percent limitation applies to taxable years ended on or after Aug. 31, 1995.

[4]The parties agree that, in addition to food and beverage expenses, the truck drivers in question paid certain incidental expenses that TLC intended the per diem amounts to cover. The parties also agree that if the Court were to hold that the limitation imposed by sec. 274(n)(1) applies, that limitation applies to the total of all per diem amounts that TLC paid during each of the taxable years at issue to those truck drivers. For convenience, we shall refer only to food and beverage expenses.

[5]Unless otherwise indicated, our Findings of Fact and Opinion pertain to the taxable years at issue.

TLC, which was incorporated in Indiana in 1986, was a wholly owned subsidiary of petitioner and a member of petitioner's affiliated group. TLC's corporate headquarters were in Arden Hills, Minnesota, its payroll services operations were in Audubon, Minnesota, and its human resources operations were in Porter, Indiana.

TLC was a driver-leasing company that leased one or more truck drivers to small and mid-sized independent trucking companies which used such truck drivers to transport goods and merchandise.[6] Prior to the times such trucking companies entered into driver-leasing arrangements with TLC (described below), they had (1) made payments to all of their respective truck drivers who worked for them that were intended to compensate such drivers for their work and (2) generally made payments (per diem payments) only to their respective over-the-road[7] truck drivers who worked for them that were intended to cover the amounts that such truck drivers spent for food and beverages while traveling away from home.

As of the beginning of taxable year 1993, TLC was leasing

---

[6]We shall refer to each trucking company that leased one or more truck drivers from TLC as a trucking company client and to each truck driver whom TLC leased to a trucking company client as a driver-employee.

[7]The term over-the-road means that the length of travel required a truck driver to stay away from home overnight.

driver-employees to approximately 100 trucking company clients.[8]
By the end of taxable year 1996, TLC was leasing driver-employees
to approximately 300 trucking company clients. Although most of
TLC's trucking company clients were located in Minnesota,
Montana, or Pennsylvania, by the end of taxable year 1996 TLC had
trucking company clients in 31 states. As of the time of trial
in this case, TLC leased a total of 5,563 driver-employees to a
total of 453 trucking company clients.

TLC's trucking company clients were engaged principally in
the over-the-road trucking industry. As of the beginning of
taxable year 1993, approximately 90 percent of TLC's trucking
company clients were over-the-road carriers, while the remaining
10 percent were local carriers. By the end of taxable year 1996,
approximately 65 percent of TLC's trucking company clients were
over-the-road carriers, and 35 percent were local carriers.

In an attempt to attract clients, TLC's sale representatives
used a variety of sales techniques, including (1) newspaper
advertisements, (2) face-to-face meetings with, and other presen-
tations to, trucking company owners, (3) brochures, (4) form
letters, and (5) other promotional mailings. Two of the bro-
chures that TLC provided to prospective clients were entitled
"The Fact Book" (Fact Book) and "Your Trucks/Our Drivers" (Your

---

[8]The number of truck drivers that each trucking company
client leased from TLC ranged from 1 to 50.

Trucks/Our Drivers).

The Fact Book, which was one of TLC's principal marketing tools, described, inter alia, the savings and other advantages that a trucking company would realize from leasing driver-employees from TLC. The Fact Book stated in pertinent part:

**Help You Stay in Compliance with Most Employment Laws**

T.L.C. hires the drivers and becomes the legal employer. And we can "prove" to your attorney's satisfaction that we are the employer based on the things we do for our employees. Plus our standing as the employer has been confirmed by the courts.

We become responsible for payroll including withholding taxes, tax filings, garnishments, child support levies, Workers Compensation insurance and claims, unemployment claims, the hiring process and terminations. We also assure compliance with most of the federal and state employer/employee laws under most circumstances.

    *       *       *       *       *       *       *

**FREE Driver Recruiting**

Professional driver recruiting is included in the T.L.C. package. Our fee is a flat percentage of a driver's gross wages, and **all our services** are included, including recruiting.

Our full-time recruiters advertise for drivers across the USA. They take applications, interview, screen, confirm physical exams and CDL status, check with former employers, verify that all the driver specifications are adhered to - including those of your liability carrier, plus we'll order MVRs [Motor Vehicle Reports] and DAC reports.

If the drivers meet our standards, we "give" these good employees to our customers.

Hiring drivers is a full-time job for our recruiters and T.L.C. has an outstanding track record of finding qualified people. Bottom Line? You'll have more

drivers with T.L.C.

Each year we recruit a number of drivers equal to 20% of the average on hand, at no cost to our clients.

**What If a Driver Applies Directly to You?**

Just send the driver to us.  We'll go through the same procedures we would follow if he had come to our re-cruiters - every key step.  We'll do it all - many times in less than four hours - and we'll cover all the expenses.  All you need to do is FAX us the application - we'll take it from there.

**T.L.C. Handles Workers Comp and Unemployment Claims**

We manage and defend all workers compensation and unemployment claims.  When a driver "quits," because we have a job for a good driver almost anywhere in the USA, we offer to reassign him to another T.L.C. client.  Accordingly, we are successful in unemployment hear-ings, and in time, cause our SUTA [State Unemployment Tax Act] rate to reach the minimum levels.

In addition to making claims concerning the advantages that a trucking company would realize from leasing driver-employees from TLC that were substantially the same as such claims appear-ing in the Fact Book, Your Trucks/Our Drivers stated in pertinent part:

TLC relieves your company of the burden of driver employee management by hiring the drivers.  These drivers perform driver services for your company under a lease agreement between TLC and your company.

\*      \*      \*      \*      \*      \*      \*

TLC is often able to use, with a different client, a driver that although qualified to drive may have a personality conflict with your staff. \* \* \*

In soliciting business, TLC's sale representatives explained to prospective trucking company clients the advantages that they

would realize from leasing driver-employees from TLC. Those advantages included TLC's (1) recruiting truck drivers, (2) obtaining workers' compensation insurance for such truck drivers, (3) substantiating the per diem amounts that TLC paid, (4) filing Federal and State tax forms, (5) withholding Federal and State income taxes, (6) maintaining truck driver files in accordance with Department of Transportation (DOT) specifications, (7) providing safety programs, and (8) handling any unemployment claims filed by a driver-employee.

A principal advantage of leasing driver-employees from TLC related to TLC's ability to obtain cost-effective workers' compensation insurance, especially in States where trucking company clients were paying substantial amounts to obtain such insurance. Generally, the premium rates for workers' compensation insurance on truck drivers were significantly higher than premium rates for most other occupations. As a result, workers' compensation insurance was a major expense for trucking companies. Whenever possible, trucking companies attempted to obtain workers' compensation insurance in the private market. However, they were frequently unable to do so and were forced to obtain such coverage through their respective States' assigned risk plans. The cost of workers' compensation insurance under such assigned risk plans was typically quite high. In soliciting a trucking company's business, TLC's sales representatives ex-

plained that TLC was able to obtain workers' compensation insurance in the private market at comparatively low premium rates because of the large number of driver-employees on whom it obtained such insurance.

After initial contacts between a sales representative of TLC and a prospective trucking company client, TLC provided the prospective client with a projection of the cost savings that it could realize from leasing driver-employees from TLC. TLC also quoted that prospective client the lease fee that TLC intended to charge if that trucking company agreed to become a client of TLC.

When TLC was successful in attracting a trucking company as a client, TLC and that trucking company entered into a contract entitled "TLC Exclusive Lease Agreement" (exclusive lease agreement), which set forth the agreement between them with respect to the leasing by such company of driver-employees from TLC.[9] When each trucking company entered into an exclusive lease agreement with TLC, such trucking company terminated the employment arrangement that it previously had with all of its truck drivers.

Each exclusive lease agreement provided in pertinent part:

---

[9]Each exclusive lease agreement was a standard TLC form contract. There were no agreements between TLC and any trucking company client regarding TLC's leasing driver-employees to such trucking company client other than the agreement set forth in the exclusive lease agreement. The material provisions of each exclusive lease agreement remained unchanged throughout the taxable years at issue except for the factor (discussed below) used to compute the lease fee that each trucking company client owed TLC.

RECITALS

I.

Lessor [TLC] is engaged in the business of providing services for truck driving operations and all related duties by virtue of lease agreements with individuals or companies.

II.

Lessee [trucking company client] is engaged in the business of a trucking operation providing for the transportation of goods and merchandise on an interstate basis.

III.

Lessor is willing to lease its employees to Lessee for truck and semi-tractor driving services and Lessee is willing to lease from Lessor such truck and semi-tractor drivers upon the terms, covenants and conditions hereinafter set forth.

        *       *       *       *       *       *       *

SECTION ONE
EXCLUSIVE LEASE

Lessor hereby leases to Lessee those drivers in the employment of Lessor during the term of the Agreement.  Lessee hereby leases Lessor's drivers on an exclusive basis and from and after the date of this Agreement, Lessee shall not employ, directly or indirectly, any drivers for its trucking operation except those agreed to be furnished by Lessor under this Lease Agreement or as otherwise provided herein.

SECTION TWO
BEST EFFORTS OF LESSOR

Lessor agrees to use its reasonable best efforts in furnishing Lessee with drivers as may be requested from  Lessee from time to time during the term of this Agreement.  Lessee understands and agrees Lessor cannot absolutely guarantee the availability of drivers for Lessee upon demand but Lessor nevertheless agrees to use its reasonable best efforts in furnishing Lessee

with any and all drivers required at all times during the terms of this Agreement.  To facilitate the availability of drivers to Lessee, Lessee shall refer to Lessor any and all qualified drivers known to it who may be suitable for employment by Lessor.

SECTION THREE
STATUS AND QUALIFICATIONS OF DRIVERS

For purposes of this Agreement and otherwise, drivers furnished by Lessor to Lessee shall in all respects be considered the employees of Lessor for all purposes including but not limited to unemployment compensation, workers' compensation, social security and other employee related duties and obligations. Lessor represents that it shall perform all the duties and responsibilities as such employer and shall in its absolute discretion, hire, fire, discipline, evaluate and direct the work and conduct on all Lessor's employees assigned to Lessee.

    *        *        *        *        *        *        *

If, due to circumstances beyond Lessor's control, Lessor's employee is unable to complete services to be provided to Lessee (due to unforeseen or unanticipated emergency, illness or other similar events) Lessee shall immediately notify Lessor thereof and Lessor shall use its reasonable best efforts to provide a replacement Lessor employee to complete the services to be provided to Lessee. * * *

    *        *        *        *        *        *        *

SECTION FIVE
COMPENSATION OF LESSOR

Lessee shall pay Lessor and Lessor shall accept from Lessee in full payment for the services to be provided by Lessor to Lessee hereinunder, a deposit and compensation as follows:
    DEPOSIT:  Upon the execution of this Agreement, Lessee shall pay and Lessor hereby acknowledges receipt of a deposit equal to the sum of Six Hundred Fifty Dollars ($650) PER TRUCK.  Said deposit represents security to Lessor for the performance of Lessee's financial and other obligations under this Agreement.  The amount of such deposit is representative of

that part of Lessor's payroll attributable to Lessee herein and the parties hereto recognize and understand such amount may fluctuate from time to time.  In this respect, the deposit amount shall be reviewed semi-annually and the amount of the required deposit shall be renegotiated and mutually agreed upon. * * *

COMPENSATION:  As and for the services to be provided by Lessor to Lessee herein, Lessor shall be compensated as follows:  On (day of the week) * * * starting Mo. * * * Day * * *, * * *, and on that same day of the week every * * * thereafter during the term of this Agreement, Lessee shall submit to Lessor its records reflecting the services provided to it by Lessor's driver in the form of hours driven, miles driven or a percent of Lessee's gross revenues attributable to the services provided to Lessee by Lessor's driver(s).  Simultaneously with the delivery of such verified records, Lessee shall deliver to Lessor payment for the amount of compensation payable to Lessor in the form of bank certified funds and in accordance with the compensation schedule as reflected on Exhibit A which is attached hereto and incorporated semi-annually from and after the date of the Agreement and the compensation schedule shall be mutually agreed upon, initialed by the parties, and attached to this Agreement.

SECTION SIX
ADVANCES BY LESSEE TO LESSOR'S EMPLOYEES

If Lessee advances cash or credit to Lessor's driver(s) for fuel, repairs or other transportation operational expenses, Lessee shall immediately furnish Lessor with written verified disclosure thereof.  If such advances are not actually expended by Lessor's driver(s) for such purposes, and the extent such funds are not returned to Lessee by Lessor's driver(s), Lessee shall deliver to Lessor a written claim therefore within fourteen (14) days of the date Lessee had knowledge of the fact that the funds or credit were not actually expended by Lessor's driver(s) and were retained by such driver(s).  Lessor shall deduct advances from the particular driver(s) next payroll check. Provided, however, that Lessor's obligation and duty to reimburse Lessee shall be limited to the extent the reimbursable amount shall not exceed the net wages, after all Lessor's payroll deductions, due the particu-

lar driver or drivers during the next applicable pay-roll period.  Any claim submitted by Lessee to Lessor in this respect after fourteen (14) days from the date that Lessor has knowledge of the fact such advances were not actually expended in its behalf by Lessor's employee may not be honored by Lessor and Lessor shall have no obligation whatsoever to reimburse or pay such unused advances to Lessee.

*     *     *     *     *     *     *

### SECTION NINE
### WARRANTIES AND REPRESENTATIONS OF LESSEE

For purposes of this Agreement, Lessee warrants and represents to Lessor as follows:

1.    That during the term of this Agreement, all trucks, semi-tractors, trailers and all related equip-ment and accessories thereto are in good working order and properly maintained, are licensed in accordance with all applicable local, state, and federal rules, regulations and statutes and any load contained within or upon any truck or trailer is legal insofar as the transportation of such load as to type, weight, and any and all other restrictions or requirements imposed by local, state or federal rules, regulations or statutes.

2.    Lessee shall not at any time during the term of this Agreement require any of Lessor's employees to run or otherwise operate Lessee's equipment and loads in any manner whatsoever which may be or which Lessee has reason to believe to be contrary to or in violation of any local, state, or federal restrictions on hours driven, miles driven, or the like.

3.    That during the term of this Agreement, Lessee shall not hire, lease, or utilize any drivers other than drivers to be furnished by Lessor hereunder except only in emergency situations duly disclosed to Lessor or upon Lessor's prior written consent.

4.    As to the representations and warranties made by Lessee in paragraphs 1 and 2 of this Section Nine, Lessor's employee shall inspect Lessee's equipment, load and routing requirements of Lessee to verify that Lessee complies with applicable local, state and fed-eral rules, regulations and statutes.  If Lessor's

employee determines that the equipment, loads or rout-
ing requirements of Lessee are in any way illegal or
contrary to the applicable local, state or federal
rules, regulations or statutes, Lessor's employee shall
immediately notify Lessee and Lessor thereof and any
dispute resulting therefrom shall be resolved by the
managing officers of Lessor and Lessee.

    \*      \*      \*      \*      \*      \*      \*

SECTION TWELVE
LIABILITY LOSS AND INDEMNIFICATION

Lessor shall not be liable to Lessee for any loss
of business or any other damage caused by an interrup-
tion of the service which Lessor agrees to furnish
hereunder when such interruption is due to war, fire,
strike, picketing, accidents, acts of God, labor dis-
putes, civil disturbances, riots, or any other causes
beyond the control of the Lessor.

Lessor shall not be responsible or held liable for
any injury or damage to person or property resulting
from the use, misuse or failure of any equipment used
by Lessee and utilized by Lessor's employees in the
performance of its services to be provided herein.  In
this respect and in all other respects, Lessee shall
indemnify Lessor against all liability or loss from and
against all claims or actions based upon or arising out
of damage or injury (including death) to persons or
property caused by or sustained in the connection with
the performance of the Agreement or by conditions
created thereby or based upon any violation of any
local, state or federal rule, regulation, ordinance or
statute and the defense of any such claims or actions,
except only as to injuries sustained by Lessor's em-
ployee, as a result of such employee's negligence or
wrongful act of the employee.

Lessor shall not be responsible for loss or damage
to equipment or cargo of Lessee by reason of collision,
fire, flood, windstorm, explosion, or other casualty.

In this respect and in all other respects Lessee
shall indemnify Lessor against all liabilities or
losses, including but not limited to those liabilities
or losses described immediately above.

Lessor shall indemnify Lessee against all liability and loss in connection with and shall assume full responsibility for payment of all federal, state and local employee taxes or contributions imposed or required under unemployment insurance, social security and income tax laws with respect to Lessor's employees engaged in the performance of the Agreement.

\* \* \* \* \* \* \*

EXHIBIT A
COMPENSATION SCHEDULE

Lessee shall compensate Lessor via certified bank funds for the services provided by Lessor's drivers by the following methods. (By cents per mile, an hourly wage, a percentage of Lessees gross revenue produced by Lessor's employees or by any other method agreed to or described below.) Any of the below which are directly attributable to services performed for the Lessee by the Lessor's employee. (See addendum A).

The above compensation multiplied by (See addendum B), surcharge or charge currently or retroactively charged the Lessor and other charges attributable to services performed. The rate is subject to change based upon federal and state tax changes and unemployment and workers compensation rates throughout the year, PLUS Lessor's portion of health insurance costs for Lessor's employees assigned to Lessee (used or not), and charges to Lessee by Lessor for Lessee's operation expense (such as fuel, tire repair, other expenses for Lessee, and charges for truck expense advances) multiplied at the rate of ONE HUNDRED (100%) percent.[10] [Reproduced

---

[10]None of the exclusive lease agreements into which TLC and a trucking company client entered prior to calendar year 1993 contained addendum A and addendum B. Instead, such exclusive lease agreements contained Exhibit A, which set forth the same type of information as that set forth in Addendum A and Addendum B that were included as part of each exclusive lease agreement into which TLC and a trucking company client entered during the taxable years at issue. Addendum A listed the type of trucking company (i.e., over-the-road or local) and the method used to compute the gross amount that TLC was to pay each driver-employee whom it leased to a trucking company client. Addendum B listed
(continued...)

literally.]

TLC retained the sole and absolute authority to hire each driver-employee and to terminate each driver-employee's employment with TLC. Each truck driver whom TLC hired as a driver-employee played an integral role in TLC's business of leasing driver-employees to its trucking company clients.

Before TLC hired a truck driver as a driver-employee, such truck driver had to pass TLC's screening and approval process that it used to determine whether to hire such truck driver. (We shall refer to the screening and approval process that TLC used to determine whether to hire a truck driver as TLC's screening and approval process.) TLC's screening and approval process was designed to determine a truck driver's fitness to serve as a driver-employee of TLC.

As required by each exclusive lease agreement, TLC used its best efforts (e.g., by advertising) to, and did, recruit driver-employees. TLC hired approximately 25 percent of its driver-employees through its own recruitment efforts.

Each trucking company client also located and referred prospective driver-employees to TLC. If a trucking company

---

[10](...continued)
the factor to which TLC and each trucking company client agreed and which such trucking company client and TLC used to compute the lease fee that such client owed to TLC under the exclusive lease agreement. The information included in those addenda to all post-1992 exclusive lease agreements was included in Exhibit A to all pre-1993 exclusive lease agreements.

client located a truck driver whom it wanted TLC to hire, the trucking company client interviewed such truck driver, had him or her complete an application provided by TLC, and forwarded that completed application to TLC. TLC subjected any such truck driver to TLC's screening and approval process. TLC rejected 10 to 15 percent of the truck drivers whom its trucking company clients referred to it. TLC hired approximately 75 percent of its driver-employees through referrals of trucking company clients.

As part of TLC's screening and approval process, TLC required each truck driver who applied for a position as a driver-employee to sign and submit a number of documents, including: (1) An application (employment application) for employment that set forth, inter alia, such truck driver's employment and medical history; (2) a certification of violations that set forth all motor vehicle violations in the past 12 months; (3) a truck driver data sheet that certified the number of hours that such truck driver had driven in the preceding 7 days; (4) Immigration and Naturalization Service Form I-9 that verified such truck driver's eligibility to work in the United States; (5) a form that authorized the release of such truck driver's employment history to TLC; (6) a form that authorized the release to TLC by appropriate State agencies of such truck driver's driving record; and (7) a form in which such truck driver consented to a

preemployment urinalysis.

After TLC concluded that a truck driver had passed TLC's screening and approval process, but before TLC hired such truck driver as a driver-employee, TLC required each truck driver to: (1) Certify that he or she did not possess more than one driver's license; (2) complete an application (assignment application) that requested assignment to a trucking company client; (3) sign a document (safe driving acknowledgment) that acknowledged that a safe driving record was a condition for employment; and (4) receive the Federal Motor Carrier Safety Regulation Pocketbook.

Each assignment application that each driver-employee completed provided in pertinent part: "it is to be understood that the applicant is an employee of Transport Leasing\Contract, Inc. [TLC] only. Applicant is not an employee of the lessee named above or herein after [sic]."

Each safe driving acknowledgment that each driver-employee signed provided in pertinent part:

>       As a condition of continued employment with Transport Labor\Contract, Inc.[,] it is understood that a safe driving record must be maintained. If driving privileges are suspended by the issuing state agency or an insurance company deems you uninsurable, we can no longer use your services.
>
>       In the above situation, dismissal would be deemed directly attributable to your actions. Unemployment claims may be denied.

TLC required each driver-employee whom it hired to sign a

document entitled "DRIVER EMPLOYEE CONTRACT" (driver contract).

Each driver contract provided in pertinent part:

> THE FOLLOWING IS A LIST OF REGULATIONS AND REQUIREMENTS
> CONCERNING YOUR EMPLOYMENT WITH TRANSPORT
> LEASING/CONTRACT, INC., (TLC).  ANY VIOLATION OF THESE
> REQUIREMENTS MAY RESULT IN DISMISSAL OR A CHARGE BEING
> MADE AGAINST THE EMPLOYEE BY TLC OR IT'S AFFILIATES.
>
>     *     *     *     *     *     *     *
>
> • ALL DRIVERS ARE TO ATTEND AT LEAST 2 SAFETY MEETINGS
> PER YEAR.
>
> ALL LOAD OVERAGES ARE THE PROPERTY OF THE SHIPPER OR
> THE TLC LESSEE.
>
> DRINKING OR BEING UNDER THE LEAST INFLUENCE OF ALCOHOL
> WHILE ON THE JOB SHALL BE GROSS MISCONDUCT AND WILL
> RESULT IN IMMEDIATE DISMISSAL.
>
> THE TAKING OF ILLEGAL DRUGS OR BEING UNDER THE INFLU-
> ENCE OF ILLEGAL DRUGS IS STRICTLY PROHIBITED BY THE
> D.O.T., FEDERAL LAW AND TLC COMPANY POLICY.  IF ANY
> EMPLOYEE IS FOUND OR TESTS POSITIVE FOR ILLEGAL DRUG
> USE, THEY WILL BE EITHER DISCHARGED IMMEDIATELY OR
> FORCED INTO A DRUG REHABILITATION PROGRAM.  ALL DRIVERS
> ARE SUBJECT TO FEDERAL DRUG TESTING AS REQUIRED BY THE
> D.O.T.
>
> ALL PAPERWORK REQUIRED BY TLC OR IT'S AFFILIATES WILL
> BE DONE ON A DAILY BASIS OR AS DIRECTED.
>
> THE PERFORMANCE OF ANY JOB REQUIRED BY TLC MUST NOT BE
> AFFECTED BY A PERSONAL, LEGAL OR FINANCIAL PROBLEM OF
> THE DRIVER.  THIS ALSO INCLUDES DRIVER ATTITUDE.
>
>     *     *     *     *     *     *     *
>
> I HEREBY ACKNOWLEDGE THE FACT THAT TRANSPORT LEAS-
> ING/CONTRACT, INC. IS AN INDIANA CORPORATION AND THAT
> ANY WORKER'S COMPENSATION CLAIMS SUBMITTED BY ME WILL
> BE REPORTED TO THE STATE OF INDIANA.
>
> I FURTHER AGREE THAT IF I AM EVER INJURED ON THE JOB I
> WILL REPORT MY INJURY TO TLC, INC. IMMEDIATELY SO THEY
> MAY FILE A FIRST REPORT OF INJURY TO THE INDIANA

WORKER'S COMPENSATION BOARD.  I WILL ALSO INFORM ANY
MEDICAL FACILITY THAT I AM TREATED AT FOR SAME THAT I
AM AN EMPLOYEE OF TLC, INC. AND THAT ALL BILLINGS ARE
TO BE SENT DIRECTLY TO TLC, INC.  LASTLY, I WILL INFORM
ALL MEDICAL FACILITIES/PHYSICIANS THAT I AM AN EMPLOYEE
OF AN INDIANA CORPORATION AND THAT ALL WORKER'S COMPEN-
SATION CLAIMS SUFFERED BY ME WILL BE REPORTED TO THE
STATE OF INDIANA.

      *       *       *       *       *       *       *

STATEMENT OF COMPANY POLICY

Upon reading and reviewing this next section
[regarding types of losses involving the transportation
of goods or merchandise by a trucking company client
that is leasing a driver-employee from TLC], please be
aware that every TLC, Inc. lessee may have their own
individual regulations and requirements.  The following
may not apply in every given situation.

      *       *       *       *       *       *       *

LEVEL 3 LOSS:  A loss resulting in property damage or
bodily injury.  Property damage shall be equal to a
value of $2,000.00 but not greater than $20,000.00
combined.  Bodily injury shall be any injuries which
receive treatment away from the scene of the accident
but does not result in death, disability or disfigure-
ment of a second party.

First Offense:  A letter of reprimand, 1 week
suspension from work without compensation.

Second Offense:  (Within 9 months) Discharge from
employment.

LEVEL 4 LOSS:  A loss resulting in property damage and
or bodily injury in excess of or to the extent of:
property damage equal to or greater than $20,000.01 and
or death, disability or disfigurement of a second
party.

First Offense:  Discharge from employment.

NOTE:  The intentional failure to report any and all
incurred losses immediately shall be viewed as an act
of dishonesty of the driver.  Acts of dishonesty sub-

ject the driver to discharge from employment.  The occurrence of a Level 2, 3 or 4 Loss is automatically counted as an occurrence in the lower levels.  Therefore, if by the automatic counting of a higher occurrence into a lower level, that fills that level and subjects a driver to a more sever type of reprimand, then the more severe type of reprimand will take precedence.

*DRIVER:  The use of the word Driver refers to any company employees who have been qualified to drive for any of TLC, Inc.'s lessees.

    *        *        *        *        *        *        *

EMPLOYMENT COUNSELING:  Employment counseling may not be completed during a period of reprimand, however must be completed prior to a driver being allowed to return to work.  There shall be no compensation paid for the driver's time during an employment counseling session.  The driver's failure to complete an employment counseling session will subject the driver to discharge of employment.

    I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THE ABOVE EMPLOYMENT CONTRACT OF TRANSPORT LEASING\CONTRACT, INC. AND WILL ABIDE TO ALL POLICIES AND PROCEDURES STATED WITHIN.  I FURTHER ACCEPT THESE CONDITIONS WITH REGARD TO MY DRIVING QUALIFICATIONS AND EMPLOYMENT WITH TRANSPORT LEASING\CONTRACT, INC. [Reproduced literally.]

Both before and after entering into an exclusive lease agreement with TLC, each trucking company client:  (1) Owned or leased the trucks, semitrailers, terminals, and other equipment and facilities used in its trucking business; (2) obtained the customers whose goods and merchandise it transported by truck; (3) performed dispatching functions with respect to each driver-employee by giving such driver-employee his or her route assignments, directing each driver-employee as to the loads assigned to

him or her and as to the times by which such driver-employee had to deliver those loads, and relaying any instructions of its customers relating to such loads; (4) was responsible for the payment of tolls, fuel, repairs, and scale fees incurred during the transport of such goods and merchandise;  and (5) had the authority to determine whether to permit a driver-employee whom TLC leased to it to take any vacation days.  TLC did not own any interest in, had no rights in the profits of, and no responsibility for the losses of the business of any trucking company client.

TLC had the right to, and did, direct and control the work and conduct of each driver-employee.  Thus, TLC had the right to, and did, direct and control each driver-employee as to the operation and the loading and unloading of the truck of the trucking company client that leased such driver-employee from TLC and as to the details and means by which that operation and that loading and unloading were to be accomplished.  When TLC hired each driver-employee, TLC gave such driver-employee a packet of materials, including a truck driver handbook (TLC driver handbook), a safety manual, and a brochure entitled "Welcome to TLC". The TLC driver handbook contained TLC's detailed instructions that it required each driver-employee to follow with respect to, inter alia, fueling the trucks, starting the trucks' engines, hooking up the trucks to trailers, parking the trucks, driving

the trucks to achieve maximum fuel savings, braking the trucks, operating trucks in cold weather, departure times of the trucks, and loading the cargo on and unloading it off the trucks.[11]

After TLC hired a truck driver as a driver-employee, TLC maintained a file with respect to such driver-employee, which included such driver-employee's employment application and medical history and the results of TLC's screening and approval process with respect to such driver-employee. In addition, TLC required periodic physical examinations of each driver-employee and monitored each driver-employee to ensure that such driver-employee remained current with respect to his or her motor vehicle reports. TLC and each trucking company client maintained duplicate driver-employee personnel files that contained DOT-mandated forms and information. Each trucking company client monitored each driver-employee's compliance with DOT regulations.[12] TLC ensured that each driver-employee's file was main-

---

[11]The TLC driver handbook consisted of approximately 50 pages covering the various matters with respect to which TLC gave detailed instructions to each driver-employee. The table of contents of the TLC driver handbook listing such matters is attached as an appendix.

[12]Pursuant to the exclusive lease agreement, if a driver-employee determined "that the equipment, loads or routing requirements of * * * [a trucking company client] are in any way illegal or contrary to the applicable local, state or federal rules, regulations or statutes," such driver-employee "shall immediately notify * * * [TLC and such trucking company client] thereof and any dispute resulting therefrom shall be resolved by the managing officers of * * * [TLC and such trucking company

(continued...)

tained in accordance with DOT specifications.

TLC provided each driver-employee with a monthly newsletter and periodically provided each driver-employee with materials on driving safety, drug usage, and compliance with DOT requirements. TLC also conducted safety programs for the driver-employees, which included periodic on-site safety training for each driver-employee and safety awards and bonuses. Each trucking company client provided each driver-employee whom TLC leased to it with any necessary orientation and training with respect to such trucking company client's trucking equipment.

TLC sponsored certain employee benefits for its driver-employees, including: (1) A section 401(k) plan; (2) a section 125 flexible benefit plan; (3) group or individual health insurance; (4) a $5,000 group term life insurance policy; and (5) the option of purchasing additional group term life insurance. TLC paid the premiums associated with the $5,000 group term life insurance policy. TLC bore the administrative costs but no other costs associated with the various employee benefits that it sponsored for its driver-employees. Each driver-employee paid such other costs through payroll deductions.[13]

_____

[12](...continued)
client]."

[13]Certain trucking company clients paid at least part of the premiums associated with the health insurance plan that TLC sponsored for the driver-employees whom TLC leased to them. In
(continued...)

Pursuant to each exclusive lease agreement, each trucking company client had the right to decline using a particular driver-employee whom TLC wanted to lease to it. While TLC was leasing a driver-employee to a trucking company client, TLC had the right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee.

If a trucking company client no longer wanted or needed the services of a particular driver-employee, TLC did not continue leasing such driver-employee to that trucking company client. In that event, TLC attempted to lease such driver-employee to another trucking company client. TLC frequently was successful in reassigning a driver-employee from one trucking company client that no longer wished to use such driver-employee to another trucking company client. TLC also reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee. If a driver-employee refused such reassignment, TLC treated him or her as having voluntarily terminated his or her employment with TLC and contested any

[13](...continued)
such instances, TLC paid the trucking company client's share of such health insurance premiums and charged such premiums to the trucking company client.

unemployment claims that such driver-employee filed.[14]

Each of TLC's driver-employees who was engaged in over-the-road trucking paid for food and beverage expenses while traveling away from home. TLC generally made payments of per diem amounts to each such driver-employee that TLC intended to cover such food and beverage expenses. TLC did not pay any per diem amounts to a driver-employee whom it leased to a trucking company client that was a local carrier.

At the end of each payroll period,[15] each trucking company client mailed or sent by facsimile to TLC a batch control form (batch report) with respect to such period. For each payroll period, the batch report that each trucking company client submitted to TLC showed for each driver-employee whom TLC leased to such trucking company client, inter alia, (1) a lump sum amount (batch report lump sum amount) which was equal to the total of the gross wages[16] and any per diem amounts to which each

---

[14]Because of the large number of driver-employees and the low rate of successful claims, TLC usually paid the minimum rate imposed by the applicable State Unemployment Tax Act (SUTA).

[15]Pursuant to the exclusive lease agreement, each trucking company client had the right to select the payroll period for all driver-employees whom TLC leased to such trucking company client.

[16]We shall refer to the gross amount of wages to which a driver-employee was entitled, prior to any reduction for such driver-employee's share of Federal and State employment taxes, Federal and State income taxes withheld, and payroll deductions for employee benefits (e.g., health insurance, a sec. 401(k) plan, or a sec. 125 flexible benefit plan), as gross wages.

driver-employee was entitled but which was not broken down into such component parts;[17] (2) the total amount of expenses for gas, tolls, repairs, and other road expenses for which such trucking company client (a) made cash advances (advances)[18] and/or (b) was obligated to make reimbursements to such driver-employee (reimbursable expenses); (3) any miscellaneous credits or deductions (e.g., for the costs of health insurance that such trucking company client agreed to pay); (4) any vacation days that such trucking company client permitted such driver-employee to take;[19] and (5) the number of days such driver-employee was away from home.

TLC determined what portion of the batch report lump sum to which each driver-employee was entitled constituted gross wages and what portion, if any, constituted per diem amounts.[20]  In order to make that determination, TLC applied to each batch

---

[17]Neither the batch report nor any other document that a trucking company client submitted to TLC showed the breakdown of the batch report lump sum amount between gross wages and any per diem amounts.

[18]Except for such advances, no trucking company client made any payments to a driver-employee.

[19]If the batch report indicated that the trucking company client permitted a driver-employee whom TLC leased to it to take any vacation days, TLC paid no per diem amounts to such driver-employee for any such days.

[20]The exclusive lease agreement was silent as to (1) any per diem amounts that TLC was to pay to a driver-employee to cover such driver-employee's food and beverage expenses while traveling away from home and (2) the limitation imposed by sec. 274(n)(1).

report lump sum amount to which each driver-employee was entitled a percentage (per diem percentage). In most cases, the per diem percentage was 34 percent; in some cases, the per diem percentage ranged from zero to 33 percent.

Beginning in late calendar year 1993, TLC requested that for each payroll period each trucking company client provide it on a "Leased Driver Worksheet" certain information that the Internal Revenue Service (IRS) required in order to substantiate each driver-employee's per diem amounts.[21] The requested information for each payroll period included, inter alia, the number of days such driver-employee traveled away from home. Some of TLC's trucking company clients did not provide TLC with the information that TLC requested.[22]

Upon receipt of a batch report, TLC inputted the information contained in that batch report into its computer system and, based on that information and other information in its computer system (e.g., the per diem percentage, applicable employment tax rates, Federal and State income tax withholding), computed with

[21]As discussed above, TLC's promotional materials represented to each trucking company client that TLC was responsible for substantiating the per diem amounts that TLC paid to a driver-employee and for ensuring the appropriateness of such per diem amounts for Federal income tax purposes.

[22]When a trucking company client did not provide TLC with the information that it requested, TLC used the number of days that each driver-employee was away from home that was shown in the batch report in order to substantiate any per diem amounts that TLC determined and paid to such driver-employee.

respect to each driver-employee gross wages, any per diem amounts, Federal and State income taxes withheld, the driver-employee share of employment taxes,[23] payroll deductions for employee benefits, and net wages.[24]  Per diem amounts are not wages for purposes of computing employment taxes, Federal and State income tax withholding, and workers' compensation insurance premiums.  TLC determined each driver-employee's gross wages by reducing the batch report lump sum amount for such driver-employee by any per diem amounts that TLC determined for such driver-employee.

With respect to each driver-employee, for each payroll period TLC was obligated to, and did, pay such driver-employee his or her net wages and any per diem amounts,[25] regardless of whether the trucking company client to which TLC leased such

---

[23]We shall refer to any tax liabilities imposed on either the employer or the employee with respect to a driver-employee's gross wages under the Federal Insurance Contribution Act, the Federal Unemployment Tax Act, or SUTA as employment taxes.

[24]We shall refer to the net amount of wages to which a driver-employee was entitled, after any reduction for such driver-employee's share of Federal and State employment taxes, Federal and State income taxes withheld, and payroll deductions for employee benefits (e.g., health insurance, a sec. 401(k) plan, or a sec. 125 flexible benefit plan), as net wages.

[25]The aggregate amount of each driver-employee's net wages and any per diem amounts to which such driver-employee was entitled was increased by the amount of any reimbursable expenses for which a trucking company was obligated to reimburse such driver-employee and decreased by the amount of any advances that a trucking company client paid to such driver-employee.

driver-employee paid TLC the lease fee (discussed below). TLC generally paid such net wages and any per diem amounts to each driver-employee on the day after TLC received a batch report. (We shall refer to TLC's obligation with respect to each driver-employee for each payroll period to pay to each such driver-employee such aggregate amount of net wages and any per diem amounts as well as its obligation to pay the employer's share of employment taxes, withhold and pay the driver-employee's share of employment taxes, withhold and pay Federal and State income taxes, make daily electronic funds transfers of the appropriate amounts of such taxes to the IRS and appropriate State agencies, and pay workers' compensation insurance premiums as TLC's payroll obligation.) TLC paid each driver-employee by either mailing a check directly to such driver-employee or sending a check via overnight delivery to the trucking company client to whom TLC leased such driver-employee for distribution to such driver-employee.

At the time TLC paid each driver-employee, TLC sent such driver-employee an earnings statement showing, inter alia, the batch report lump sum amount to which he or she was entitled, net wages, any per diem amounts, Federal and State income taxes withheld and paid, the driver-employee's share of employment taxes withheld and paid, and any other payroll deductions.

At the time TLC paid each driver-employee, TLC generated and

sent to the trucking company client that leased such driver-employee from TLC documents entitled "Statement" (account statement), "Invoice" (account invoice), and "Precheck report" (precheck report). The account statement showed the most recent debits and credits to each trucking company client's account and any credit or balance due on that account.[26] The account invoice showed TLC's total expenses for each payroll period for all the driver-employees whom it leased to a trucking company client.[27] The precheck report showed for each driver-employee for each payroll period his or her gross wages, any per diem amounts, Federal and State income taxes withheld and paid, the driver-employee's share of employment taxes paid, payroll deductions for employee benefits, and net wages.

During the taxable years 1993, 1994, 1995, 1996, and 1997, TLC paid its driver-employees per diem amounts totaling $4,841,563, $7,111,060, $8,617,378, $9,934,172, and $10,178,691, respectively.

---

[26]In some instances the account statements covered the two most recent payroll periods, while in other instances the account statements covered the three most recent payroll periods.

[27]Each account invoice showed TLC's expenses for a payroll period including, inter alia, the total amount of gross wages and the total amount of any per diem amounts that TLC paid to all the driver-employees whom TLC leased to a trucking company client, the total amount of advances that a trucking company client paid to the driver-employees whom TLC leased to it, and the total amounts that TLC paid for health insurance for which the trucking company client reimbursed TLC.

Pursuant to each exclusive lease agreement, each payroll period each trucking company client paid TLC a lease fee (lease fee) that was not broken down into component parts.[28]  Each exclusive lease agreement set forth a factor (factor)[29] to which TLC and each trucking company client agreed and which such client was to multiply by the batch report lump sum amount in order to determine the lease fee that such client owed to TLC for each driver-employee whom TLC leased to such client.

The factor to which TLC and each trucking company client agreed was intended to produce a lease fee sufficient to cover: (1) The batch report lump sum amount for each driver-employee whom TLC leased to such trucking company client; (2) the employer's share of employment taxes on the gross wages paid to each such driver-employee; (3) workers' compensation insurance

---

[28]Pursuant to each exclusive lease agreement, each trucking company client, and not TLC, selected the method used to "compensate * * * [TLC] * * * for the services provided by * * * [TLC's] * * * drivers".  Virtually all of TLC's trucking company clients selected a cents-per-mile or a percentage-of-load-gross-revenue basis as the applicable method.

[29]Pursuant to the exclusive lease agreement, TLC had the right to modify the factor in the event Federal and State employment tax rates and/or workers' compensation insurance rates changed.  From time to time, TLC modified the factor that it charged each trucking company client in order to reflect changes in TLC's workers' compensation insurance premiums.  TLC and each trucking company client also had the right to modify the factor if, inter alia, the information that TLC collected from a trucking company client in order to substantiate the per diem amounts that TLC paid to the driver-employees whom it leased to such client changed (e.g., if a trucking company client reduced its over-the-road trucking business).

premiums attributable to the gross wages earned by each such driver-employee; (4) other expenses that TLC incurred as costs of earning such lease fee, e.g., expenses for sales representatives and managers, legal and accounting services, and other overhead; and (5) TLC's profit (gross profit).

The factor was a flat rate that ranged from 1.15 to 1.25. The factor was not broken down into component parts. Consequently, no trucking company client knew how much of the factor to which TLC and such trucking company client agreed was intended to cover each of the various expenses associated with TLC's driver-leasing business (e.g., the employer's share of employment taxes, workers' compensation insurance, any per diem amounts, and compensation of persons who performed services for TLC other than TLC's driver-employees).

The per diem percentage that TLC used to determine any per diem amounts of each driver-employee affected the factor that was used to compute the lease fee that each trucking company client owed to TLC. As discussed above, per diem amounts are not wages for purposes of computing employment taxes, Federal and State income taxes withheld, and workers' compensation insurance premiums, and a higher per diem percentage resulted in a lower wage base for purposes of computing such amounts. A lower wage base resulted in lower employment taxes, Federal and State income taxes withheld, and workers' compensation premiums, which, in

turn, reduced the factor. The amount of TLC's gross profit, however, was not affected by the per diem percentage that TLC used to determine any per diem amounts of each driver-employee.

The batch report that each trucking company client submitted to TLC each payroll period included each trucking company client's computation of the lease fee to which TLC was entitled under the terms of the exclusive lease agreement. In order to determine the amount of such lease fee payable to TLC for each payroll period, each trucking company client increased the amount of the lease fee to which TLC was entitled by (1)(a) the total amount of the reimbursable expenses due to each driver-employee whom TLC leased to such trucking company client and (b) any miscellaneous additions or carryover credits and reduced that sum by (2)(a) the total amount of advances that such trucking company client paid to each driver-employee whom TLC leased to it and (b) any miscellaneous subtractions or debit balances. (We shall refer to the amount of the lease fee payable each payroll period to TLC by each trucking company client after such additions and subtractions as the payroll period net lease fee due.)

Each trucking company client generally paid TLC the payroll period net lease fee due, as reflected in the batch report, on the day on which TLC issued a check to each driver-employee for such driver-employee's net wages and any per diem amounts. Each trucking company client paid such payroll period net lease fee

due by wire transfer or direct deposit into an account of TLC. TLC did not maintain separate accounts for the funds received from each trucking company client.

In order to minimize TLC's loss in the event a trucking company client did not pay to it the payroll period net lease fee due, each exclusive lease agreement required each trucking company client to make a deposit with TLC equal to $650 per truck ($650 deposit). TLC intended the $650 deposit to approximate TLC's payroll obligation for one week for each driver-employee whom it leased to a trucking company client. The $650 deposit that each trucking company client paid to TLC did not ensure that TLC had sufficient funds to pay TLC's payroll obligation with respect to each driver-employee whom it leased to such trucking company client where (1) such trucking company client selected a payroll period that covered more than one week and/or (2) such driver-employee was entitled to a batch report lump sum amount that was greater than $650 per payroll period.

For the calendar years 1993, 1994, 1995, and 1996, TLC sent a form letter (per diem letter) to each trucking company client, which set forth the total of all per diem amounts that TLC paid to the driver-employees whom it leased to such trucking company client during the preceding calendar year. The per diem letter for calendar year 1993 (sent to each trucking company client early in calender year 1994) stated in pertinent part:

Our billings to you include amounts paid, on your
behalf, to our drivers, for road expenses; often re-
ferred to as per diem.  The amounts billed are of
course, reduced by the amounts you paid directly to the
drivers in the form of "advances", frequently an amount
approximating an allowable per diem.

As required by tax law and part of our service, we have
tabulated the per diems to be used in your tax return
preparation.  As payer of these amounts, you must
afford them special treatment under the 20% reduction
provision of Internal Revenue Code Section 274(n).  You
should take this into account when preparing your tax
returns for your business and may want to forward a
copy of this letter to your tax advisor.

The amount of per diem you paid to drivers, or which we
partially paid on your behalf during 1993, was * * *
[total of per diem amounts.[30]]

Petitioner filed consolidated Form 1120, U.S. Corporation
Income Tax Return (Form 1120), as the parent corporation of a
group of affiliated corporations for each of petitioner's taxable
years 1993, 1994, 1995, and 1996.  Schedule K, Other Information,
included as part of each of those Forms 1120 showed business
activity as "leasing" and product or service as "employees".
Form 851, Affiliations Schedule, included as part of those Forms
1120 showed TLC's business activity as "leasing".

On or about March 27, 1996, respondent notified petitioner
that respondent intended to commence the examination upon which
this case is based.

---

[30]The per diem letters for each of the calendar years 1994,
1995, and 1996 were identical to the per diem letter for calendar
year 1993 except that the reference to "20% reduction" was
changed to "50% percent reduction" in order to reflect changes
made to sec. 274(n)(1) by OBRA 1993.  See supra note 3.

On October 27, 2000, respondent sent a notice of deficiency (notice) to petitioner.  In that notice, respondent determined, inter alia, that the limitation imposed by section 274(n)(1) applied to the per diem amounts that TLC paid to its driver-employees.

Respondent sent a notice to each of the following trucking company clients of TLC in which respondent determined that each such trucking company client had a deficiency in tax for one or more taxable years[31] arising out of such trucking company client's failure to take into account the limitation imposed by section 274(n)(1)[32] and with respect to which each such trucking company client commenced proceedings in the Court, as follows:

---

[31]The record does not disclose the taxable year(s) to which each of the notices issued to certain of TLC's trucking company clients pertained.

[32]See supra note 3.

| Trucking Company Client | Case at Docket No. |
|---|---|
| John and Kimberly Kohler (NBS Trucking) | 1026-01 |
| Joseph and Barbara Hix (Joe Hix Trucking) | 1062-01 |
| Blachowske Truck Line, Inc. | 1107-01 |
| Jones Brothers Trucking, Inc. | 1149-01 |
| Lake State Transport, Inc. | 1286-01 |
| Schak Trucking Inc. | 1287-01 |
| Donald Fiereck and Beverly Beumer-Fiereck (Parkway Auto Transport) | 1346-01 |

Respondent conceded the above-referenced cases.  The Court entered stipulated decisions in such cases, which reflected such concessions.

OPINION

Petitioner bears the burden of proving that the determinations in the notice are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Respondent bears the burden of proof with respect to the respective increases in the deficiencies in tax for petitioner's taxable years 1994, 1995, and 1996 that respondent alleged in the amendment to answer.  Rule 142(a)(1).

We must determine whether the limitation imposed by section 274(n)(1) (section 274(n)(1) limitation) applies to the per diem amounts that TLC paid to each driver-employee.  Section 274(n)(1) imposes the following limitation on the amount otherwise allow-

able as a deduction for food or beverage expenses:

> SEC. 274.  DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC.,
>           EXPENSES.
>
>    *      *      *      *      *      *      *
>
>      (n) Only 50 Percent of Meal * * * Expenses Allowed
> as Deduction.--
>
>           (1) In general.--The amount allowable as a
>      deduction under this chapter for--
>
>                (A) any expense for food or bever-
>           ages, * * *
>
>    *      *      *      *      *      *      *
>
> shall not exceed 50[33] percent of the amount of such
> expense or item which would (but for this paragraph) be
> allowable as a deduction under this chapter.

Section 274(n)(2) provides certain exceptions to the section

274(n)(1) limitation, including the following:

>      (2) Exceptions.--Paragraph (1) [of section 274(n)]
> shall not apply to any expense if--
>
>           (A) such expense is described in paragraph
>      (2), (3), (4), (7), (8), or (9) of subsection (e).

The exceptions to the section 274(n)(1) limitation provided

by section 274(e)(3) (section 274(e)(3) exceptions) are for:

>      (3) Reimbursed expenses.--Expenses paid or in-
> curred by the taxpayer, in connection with the perfor-
> mance by him of services for another person (whether or
> not such other person is his employer), under a reim-
> bursement or other expense allowance arrangement with
> such other person, but this paragraph shall apply--
>
>           (A) where the services are performed for
>      an employer, only if the employer has not

---

[33]See *supra* note 3.

treated such expenses in the manner provided in paragraph (2) [of section 274(e)], or

> (B) where the services are performed for a person other than an employer, only if the taxpayer accounts (to the extent provided by subsection (d) [of section 274]) to such person.

The regulations elaborating on the section 274(e)(3) exceptions provide in pertinent part:

> In the case of any expenditure * * * paid or incurred by one person in connection with the performance by him of services for another person (whether or not such other person is an employer) under a reimbursement or other expense allowance arrangement, the limitations on allowability of deductions provided for in * * * this section shall be applied only once, either (1) to the person who makes the expenditure or (2) to the person who actually bears the expense, but not to both. * * *

Sec. 1.274-2(f)(2)(iv)(a), Income Tax Regs.

It is petitioner's position that Beech Trucking Co. v. Commissioner, 118 T.C. 428 (2002), requires the Court to hold in the instant case that

> In the case of a three-party arrangement in which a professional employer organization leases truck drivers to trucking companies, * * * the party which is subject to the Section 274(n) limitation * * * is the common-law employer of the truck drivers.

According to petitioner, under Beech Trucking Co. v. Commissioner, supra, TLC was not the employer[34] of any driver-employee and thus is not subject to the section 274(n)(1) limitation on

_____

[34]We accord the term "employer" the same meaning as the term "common-law employer". For convenience, we shall use only the term "employer".

the per diem amounts at issue.

Respondent disagrees with petitioner's reading of <u>Beech Trucking Co. v. Commissioner</u>, <u>supra</u>. According to respondent, <u>Beech Trucking Co.</u> requires the Court to hold in the instant case that the section 274(n)(1) limitation applies to the person who paid or incurred, or actually bore,[35] the food or beverage expenses in question and that that person is TLC.

The parties in <u>Beech Trucking Co. v. Commissioner</u>, <u>supra</u>, agreed that the truck drivers in question were employees not subject to the section 274(n)(1) limitation because such truck drivers qualified for the exception to that limitation provided by section 274(e)(3)(A) (section 274(e)(3)(A) exception). The parties in <u>Beech Trucking Co.</u> also agreed that the section 274(n)(1) limitation applied to the employer of those truck drivers. It was in the context of those agreements that the Court stated in <u>Beech Trucking Co. v. Commissioner</u>, <u>supra</u> at 440, 443:

> with respect to meal and entertainment expenses that an employee pays or incurs and that are reimbursed by the employer, the section 274(n) limitation applies either to the employee (as the "person who makes the expenditure") or to the employer (as the "person who actually bears the expense"). Sec. 1.274-2(f)(2)(iv)(<u>a</u>), Income Tax Regs.

>         *       *       *       *       *       *       *

---

[35]Respondent accords the words "paid or incurred" the same meaning as the words "actually bore".

　　　　* * * we conclude that the section 274(n) limitation applies to Beech Trucking as the common law employer of its drivers and as the party that (as petitioner states on brief) actually bore the expense of the expenditures for which the per diem payments were made [by the company that leased the drivers to Beech Trucking]. * * *

We decline petitioner's invitation to read into the above-quoted or any other statements in Beech Trucking Co. v. Commissioner, supra, that, in all instances involving a three-party arrangement among a truck driver who is an employee (truck driver-employee), a trucking company, and a company (driver-leasing company) that provides, for a fee, the services of such a truck driver to such a trucking company, the employer of the truck driver is the person subject to the section 274(n)(1) limitation.  The truck driver-employee in such a three-party arrangement might be the person who is subject to the section 274(n)(1) limitation, in which event the employer for which such truck driver worked would not be subject to such limitation.  See sec. 274(e)(3); see also sec. 1.274-2(f)(2)(iv)(a), Income Tax Regs.

We also decline respondent's invitation to read into the above-quoted or any other statements in Beech Trucking Co. v. Commissioner, supra, that, in all instances involving a three-party arrangement among a truck driver-employee, a trucking company, and a driver-leasing company, the person who pays or incurs or actually bears the food or beverage expenses is the

person subject to the section 274(n)(1) limitation, and that person may or may not be the employer of the truck driver-employee. In support of such an interpretation of Beech Trucking Co., respondent asserts:

> While the Court in Beech did look to the fact that Beech was the drivers' common law employer, it also looked to the fact that Beech was the party that "actually bore the expense" of the * * * per diem. * * * And it is this latter inquiry that goes to the central question of whether the taxpayer paid or incurred an otherwise deductible expenditure for food or beverages which is subject to the limitation of section 274(n). * * *

> The ultimate question under section 274(n) is whether the taxpayer paid or incurred an expense for food or beverages. In the case of * * * per diem paid employees in a three-party employee leasing arrangement, the party which is the common law employer and the party which pays and incurs the food or beverage expense will not necessarily be one and the same.

In Beech Trucking Co. v. Commissioner, 118 T.C. at 443, the Court concluded that the section 274(n)(1) limitation applied to Beech Trucking "as the common law employer of its drivers and as the party that * * * actually bore the expense of the expenditures for which the per diem payments were made [by the driver-leasing company]." That conclusion is merely a restatement of what the regulations under the section 274(e)(3)(A) exception provide where a person performs services for an employer under a reimbursement or other expense allowance arrangement and the requirements of section 274(e)(3)(A) are met; namely, in such a situation the limitations imposed by section 274(n), inter alia,

section 274(n)(1) are to be applied only to the employer as the person who actually bears the expense, and not to the employee as the person making the expenditure.[36]  Sec. 1.274-2(f)(2)(iv)(a) and (b), Income Tax Regs.

We reject respondent's assertions (1) that the question of who actually bore the expense of the per diem payments involved in Beech Trucking Co. v. Commissioner, supra, was the central question in that case in determining whether Beech Trucking Co., Inc. was subject to the section 274(n)(1) limitation and (2) that, in a three-party arrangement among a truck driver-employee, a trucking company, and a driver-leasing company, the person who is the employer of the truck driver will not necessarily be the person who pays or incurs or actually bears the food or beverage expenses.  The parties in Beech Trucking Co. agreed that the truck drivers in question were employees not subject to the section 274(n)(1) limitation because of the section 274(e)(3)(A) exception and that consequently the employer of those truck drivers was subject to the section 274(n)(1) limitation.  See sec. 1.274-2(f)(2)(iv)(a) and (b), Income Tax Regs.

---

[36]Where a person performs services for a nonemployer-client under a reimbursement or other expense allowance arrangement and the requirements of sec. 274(e)(3)(B) are met, the regulations under the section 274(e)(3)(B) exception provide that the limitations under, inter alia, sec. 274(n)(1) are to be applied only to the nonemployer-client as the person who actually bears the expense, and not to the independent contractor as the person making the expenditure.  Sec. 1.274-2(f)(2)(iv)(a), (c), Income Tax Regs.

However, the taxpayer in that case claimed that it was not the employer of those truck drivers and that therefore it was not subject to the section 274(n)(1) limitation. As a result, a threshold question in Beech Trucking Co. v. Commissioner, supra, was whether the taxpayer was the employer of such truck drivers.[37] If the taxpayer in Beech Trucking Co. was the employer of the truck drivers in question, the taxpayer, as such employer, necessarily would have borne the food or beverage expenditures that those truck drivers made. If the taxpayer in Beech Trucking Co. was not the employer of the truck drivers in question, the taxpayer necessarily would not have borne such expenditures. See Beech Trucking Co. v. Commissioner, supra at 440, 443; sec. 1.274-2(f)(2)(iv)(a), Income Tax Regs.

In the instant case, the parties agree and/or do not dispute that: (1) No driver-employee is an independent contractor but each is an employee who performed services for a person who is an employer; (2) while traveling away from home, each driver-employee paid or incurred food and beverage expenses in connection

---

[37]Having decided as a threshold matter that the taxpayer in Beech Trucking Co. v. Commissioner, 118 T.C. 428 (2002), was the employer of the truck drivers in question, the Court addressed the central question presented in that case of whether Rev. Proc. 94-77, 1994-2 C.B. 825, and Rev. Proc. 96-28, 1996-1 C.B. 686, were valid in characterizing the employer-taxpayer's payments of the per diem amounts at issue in Beech Trucking Co. as payments only for food and beverage expenses, and not for lodging expenses, and in applying the section 274(n)(1) limitation to the entire amounts of such payments.

with the performance by such driver-employee of services for such employer under a reimbursement or other expense allowance arrangement with such employer; (3) such expenses, as well as the per diem amounts that TLC paid to each driver-employee, are the kinds of expenses that generally are subject to the section 274(n)(1) limitation; and (4) no driver-employee is subject to the section 274(n)(1) limitation because each driver-employee qualifies for the section 274(e)(3)(A) exception.

As a result of the parties' agreement regarding, and/or their failure to dispute, the foregoing matters, we conclude that our resolution of the disagreement between the parties over whether the section 274(n)(1) limitation applies to the per diem amounts that TLC paid to each driver-employee depends on our resolution of the dispute between them over whether TLC was the employer of each such driver-employee.

It is petitioner's position that each trucking company client of TLC, and not TLC, was the employer of each driver-employee, the services of whom TLC provided, for a fee, to such trucking company client and that, under the doctrine of judicial estoppel, the Court should preclude respondent from arguing that TLC was the employer of each driver-employee.

It is respondent's position that the Court should not allow petitioner to disavow TLC's status as the employer of each driver-employee. That is because, according to respondent, TLC

held itself out as the employer of each driver-employee to the public, including to each trucking company client, the IRS, and various State workers' compensation plans. Respondent also argues that if the Court were to allow petitioner to disavow TLC's status as the employer of each driver-employee, petitioner must demonstrate by strong proof[38] that TLC was not the employer of each driver-employee. Respondent further maintains that if the Court not only were to allow petitioner to disavow TLC's status as the employer of each driver-employee but also were to reject respondent's argument that the strong proof rule is applicable in the instant case, the record nonetheless establishes that TLC was the employer of each driver-employee.

We consider first petitioner's argument that, under the doctrine of judicial estoppel, the Court should preclude respondent from contending that TLC was the employer of each driver-employee. According to petitioner, the Court should apply that doctrine in the instant case because the Commissioner of Internal

---

[38]"Strong proof must be put forth by * * * [taxpayers] for this Court to disregard the form in which they cast their transactions in an arm's-length deal." Miami Purchasing Serv. Corp. v. Commissioner, 76 T.C. 818, 830 (1981); see also Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 438 (1994). Strong proof constitutes more than a mere preponderance of the evidence. See Major v. Commissioner, 76 T.C. 239, 247 (1981). In the instant case, respondent contends that under each exclusive lease agreement between TLC and each trucking company client TLC cast itself as the employer of each driver-employee whom it leased to such trucking company client and that therefore petitioner must present strong proof that TLC was not in fact the employer of each such driver-employee.

Revenue (Commissioner) took the position in <u>Beech Trucking Co. v. Commissioner</u>, 118 T.C. 428 (2002), that the driver-leasing company in that case (i.e., Arkansas Trucking Service) was not the employer of the truck drivers whom it leased to Beech Trucking Co., Inc., whereas the Commissioner takes the inconsistent position in the instant case that the driver-leasing company in this case (i.e., TLC) was the employer of each driver-employee whom it leased to each trucking company client.

The doctrine of judicial estoppel is designed to protect the integrity of the courts by preventing a party from asserting positions contradictory to or inconsistent with positions asserted in prior litigation. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-750 (2001); <u>Leonard v. Southwestern Bell Corp. Disability Income Plan</u>, 341 F.3d 696, 702 (8th Cir. 2003); <u>Huddleston v. Commissioner</u>, 100 T.C. 17, 26 (1993). We observed in <u>Huddleston v. Commissioner</u>, <u>supra</u> at 26:

> Judicial estoppel generally requires acceptance by a court of the prior position and does not require privity or detrimental reliance of the party seeking to invoke judicial estoppel. * * * Acceptance by a court does not mean that the party being estopped prevailed in the prior proceeding with regard to the ultimate matter in dispute, but rather only that a particular position or argument asserted by the party in the prior proceeding was accepted by the court. * * *

The Court has discretion as to whether to invoke the doctrine of judicial estoppel. <u>Fazi v. Commissioner</u>, 105 T.C. 436, 446 (1995).

Where there is a "possibility that 'some distinction may exist or arise' between * * * [the prior case and the case under consideration], the integrity of the judicial process is not undermined by permitting the * * * [party against whom judicial estoppel is advanced] an opportunity to argue that such a distinction in fact exists." Bendet v. Sandoz Pharm. Corp., 308 F.3d 907, 910 (8th Cir. 2002).

The determination of whether a person is an employer is a fact-intensive inquiry. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324 (1992); Alford v. United States, 116 F.3d 334, 337 (8th Cir. 1997); Beech Trucking Co. v. Commissioner, supra at 441. Respondent argues here that the facts in Beech Trucking Co. v. Commissioner, supra, are different from the facts in the instant case.[39] On the record before us, we shall not apply the doctrine of judicial estoppel so as to preclude respondent from taking the position that, under the facts established by the

---

[39]The evidentiary record presented in Beech Trucking Co. v. Commissioner, 118 T.C. at 441, was sparse. We stated in that case:

> the evidentiary basis for analyzing the relevant common law factors is relatively sparse, owing largely to petitioner's failure to introduce in evidence or otherwise establish the precise terms of any lease agreement, employment agreement, or contract between Beech Trucking and ATS [the driver-leasing company]. Nor does the record contain the drivers' employment contracts. Moreover, the record does not always clearly distinguish the roles of Beech Trucking and ATS with respect to the drivers' activities. * * *

record in this case, TLC was the employer of each driver-employee.

We turn next to respondent's arguments that the Court should not allow petitioner to disavow TLC's status as the employer of each driver-employee and that if the Court were to allow petitioner to do so, petitioner must demonstrate by strong proof that TLC was not the employer of each driver-employee. Assuming arguendo that we were to reject such arguments of respondent, on the instant record we nonetheless would, and do below, reject petitioner's position that TLC was not the employer of each driver-employee. Consequently, we need not, and we shall not, consider such arguments of respondent. Instead, we shall determine whether TLC was the employer of each driver-employee.

In determining whether TLC was the employer of each driver-employee, we shall apply the common-law employment test. Nationwide Mut. Ins. Co. v. Darden, supra at 322-324; Alford v. United States, supra at 337-338; Beech Trucking Co. v. Commissioner, 118 T.C. at 440. In determining under the common-law employment test whether TLC was the employer of each driver-employee, we shall consider a variety of factors, including the following:

> the skill required; the source of the instrumentalities
> and tools; the location of the work; the duration of
> the relationship between the parties; whether the
> hiring party has the right to assign additional pro-
> jects to the hired party; the extent of the hired
> party's discretion over when and how long to work; the
> method of payment; the hired party's role in hiring and
> paying assistants; whether the work is part of the

regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Nationwide Mut. Ins. Co. v. Darden, supra at 323-324.

A primary consideration in determining which of two persons is the employer of an individual is "which of the two [persons] has the right to control the activities of the individual". Leavell v. Commissioner, 104 T.C. 140, 150 (1995); see Schweiger v. Farm Bureau Ins. Co., 207 F.3d 480, 484 (8th Cir. 2000); Beech Trucking Co. v. Commissioner, supra at 441; Weber v. Commissioner, 103 T.C. 378, 387 (1994), affd. per curiam 60 F.3d 1104 (4th Cir. 1995); Profl. & Executive Leasing Inc. v. Commissioner, 89 T.C. 225, 232-233 (1987), affd. 862 F.2d 751 (9th Cir. 1988); sec. 31.3121(d)-1(c)(2), Employment Tax Regs.

Before considering the factors under the common-law employment test, we shall address the testimony of Gary Ankerfelt (Mr. Ankerfelt) on which petitioner relies to support its position that TLC was not the employer of each driver-employee. From TLC's inception until 2000, Mr. Ankerfelt was TLC's president and chief executive officer. According to petitioner, Mr. Ankerfelt's testimony establishes that the provisions of each exclusive lease agreement which gave TLC the sole and absolute authority to hire, fire, and control the work and conduct of each driver-employee do not mean what they say. In this regard, Mr. Ankerfelt testified: (1) TLC exercised only an advisory role in

hiring each driver-employee; (2) without exception, the trucking company client made the decision to terminate any driver-employee whom TLC leased to it; and (3) while TLC was leasing a driver-employee to a trucking company client, TLC had no right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee.

On the record before us, we find that respondent impeached the foregoing testimony of Mr. Ankerfelt. Respondent introduced into the record an affidavit (Mr. Ankerfelt's affidavit) that Mr. Ankerfelt made under oath in Hix v. Minn. Workers' Comp. Assigned Risk Plan, 520 N.W.2d 497 (1994).[40] In that affidavit, Mr. Ankerfelt swore under oath that:

> TLC has sole authority to determine the assignment of a driver.
>
> * * * TLC retains the sole right to discharge and fire any of its drivers-employees [sic]. When a lessee [trucking company client] no longer desires to lease a TLC driver-employee, the TLC driver-employee returns to TLC for assignment to another lessee.

Not only did respondent impeach Mr. Ankerfelt's testimony with Mr. Ankerfelt's affidavit, respondent also raised other questions about the reliability of Mr. Ankerfelt's testimony that TLC exercised only an advisory role in hiring each driver-em-

---

[40]Joe Hix was one of TLC's trucking company clients. The court in Hix v. Minn. Workers' Comp. Assigned Risk Plan, 520 N.W.2d 497, 508 (1994), held that, for purposes of Minnesota's workers' compensation laws, Joe Hix was not the employer of any driver-employee whom he leased from TLC.

ployee.  Respondent called as a witness Beverly Fiereck (Ms.
Fiereck), the president of Parkway Auto Transport (Parkway), one
of TLC's trucking company clients.[41]  She testified that TLC, and
not Parkway, decided whether or not to hire a truck driver whom
Parkway referred to it.[42]  We found Ms. Fiereck to be credible.

Moreover, the record establishes (1) that TLC successfully
recruited and hired approximately 25 percent of its driver-
employees through its own recruiting efforts and (2) that TLC
rejected 10 to 15 percent of the truck drivers whom its trucking
company clients referred to it.

We shall not rely on Mr. Ankerfelt's testimony to support
petitioner's position that TLC was not the employer of each
driver-employee.  See Lerch v. Commissioner, 877 F.2d 624, 631-

---

[41]The parties stipulated that the testimony of any person
representing Parkway is to be considered representative of the
testimony that would be given by any persons representing other
trucking company clients of TLC if they had been called to
testify at the trial in this case.

[42]Each exclusive lease agreement provided in pertinent part:

    Lessor agrees to use its reasonable best efforts
    in furnishing Lessee with drivers as may be requested
    from Lessee from time to time during the term of this
    Agreement.  Lessee understands and agrees Lessor cannot
    absolutely guarantee the availability of drivers for
    Lessee upon demand but Lessor nevertheless agrees to
    use its reasonable best efforts in furnishing Lessee
    with any and all drivers required at all times during
    the terms of this Agreement.  To facilitate the avail-
    ability of drivers to Lessee, Lessee shall refer to
    Lessor any and all qualified drivers known to it who
    may be suitable for employment by Lessor.

632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

We shall now address the factors under the common-law employment test in order to determine whether TLC was the employer of each driver-employee.

Right To Control Driver-Employee

Petitioner argues that each trucking company client exercised control over the activities of a driver-employee whom TLC leased to it by giving such driver-employee his or her route assignments, directing such driver-employee as to the loads assigned to him or her and as to the times by which such driver-employee had to deliver those loads, and relaying any customer instructions relating to such loads.

Respondent counters that the foregoing assignments, directions, and instructions that each trucking company client gave to a driver-employee whom TLC leased to it were merely dispatching functions "which, as a practical matter, could only be performed by the Trucking Companies, and the fact that they did so has little bearing on which party was the Drivers' employer."

Section 31.3121(d)-1(c)(2), Employment Tax Regs., describes the right to control an employee as follows:

> the person for whom services are performed has the
> right to control and direct the individual who performs

the services, not only as to the result to be accom-
plished by the work but also as to the details and
means by which that result is accomplished.  That is,
an employee is subject to the will and control of the
employer not only as to what shall be done but how it
shall be done.  In this connection, it is not necessary
that the employer actually direct or control the manner
in which the services are performed; it is sufficient
if he has the right to do so. * * *

We have found that TLC had the right to, and did, direct and control the work and conduct of each driver-employee.[43]  Thus, TLC had the right to, and did, direct and control each driver-employee as to the operation and the loading and unloading of the truck of the trucking company client that leased such driver-employee from TLC and as to the details and means by which that operation and that loading and unloading were to be accomplished. The TLC driver handbook, which TLC gave to each driver-employee when it hired such driver-employee, contained TLC's detailed instructions that it required each driver-employee to follow with respect to, inter alia, fueling the trucks, starting the trucks' engines, hooking up the trucks to trailers, parking the trucks, driving the trucks to achieve maximum fuel savings, braking the trucks, operating trucks in cold weather, departure times of the trucks, and loading the cargo on and unloading it off the

---

[43]The exclusive lease agreement provided that TLC "shall in its absolute discretion, * * * direct the work and conduct" of each driver-employee.

trucks.[44]

Moreover, the driver contract, which each driver-employee signed when TLC hired such driver-employee, required each driver-employee to attend each year at least two safety meetings that TLC sponsored, to complete any paperwork that TLC (or its affiliates) requested on a daily basis or as directed, and to perform any work that TLC required of such driver-employer without letting any of his or her personal problems, including attitude, affect such performance.

On the record before us, we find that TLC had the right to control each driver-employee within the meaning of section 31.3121(d)-1(c)(2), Employment Tax Regs. The dispatching functions (i.e., route assignments, directions as to the loads assigned and the times when such loads had to be delivered, and any customer instructions relating to such loads) that each of TLC's trucking company clients performed did not give such trucking company client control over each driver-employee within the meaning of those regulations.

On the record before us, we find that TLC's right to direct and control the work and conduct of each driver-employee is a factor evidencing that TLC was the employer of each driver-employee.

---

[44]See supra note 11.

Hiring of Each Driver-Employee

Petitioner argues that TLC exercised only an advisory role in hiring each driver-employee. Petitioner also points out that, when a trucking company became a client of TLC, the truck drivers who had worked for that trucking company continued performing work at that trucking company client as driver-employees.

Respondent counters that the exclusive lease agreement provided that TLC had the sole and absolute authority to hire each driver-employee and that TLC did not hire a truck driver as a driver-employee until he or she passed TLC's screening and approval process. According to respondent, TLC's screening and approval process was no formality, and in fact TLC rejected 10 to 15 percent of the truck drivers whom its trucking company clients referred to it.

We have found that TLC had the sole and absolute authority to hire each driver-employee. Before TLC hired a truck driver as a driver-employee, such truck driver had to pass TLC's screening and approval process. TLC rejected 10 to 15 percent of the truck drivers whom its trucking company clients referred to it. Moreover, TLC hired approximately 25 percent of its driver-employees through its own recruitment efforts. Ms. Fiereck, the president of Parkway, testified that TLC, and not Parkway, decided whether or not it would hire truck drivers whom Parkway

referred to TLC.[45]

On the record before us, we find that TLC's sole and absolute authority to hire each driver-employee is a factor evidencing that TLC was the employer of each driver-employee.

Source of the Instrumentalities and Tools

Petitioner argues that each trucking company client provided the tools and instrumentalities of each driver-employee's work because such trucking company client owned or leased the trucks that such driver-employee drove.

Respondent counters that "The fact that the Drivers did not provide their own equipment and facilities * * * is of little significance in determining by whom they were employed."

We have found that TLC was in the business of leasing driver-employees, and not in the trucking business.  In contrast, each trucking company client was in the trucking business and needed to own or lease one or more trucks in order to conduct that business.

On the record before us, we find that each trucking company client's owning or leasing the truck driven by each driver-employee whom it leased from TLC is a neutral factor in determining whether TLC was the employer of each driver-employee.

---

[45]See supra note 41.

Right to Assign Additional Projects to Each Driver-Employee

Petitioner argues that while TLC was leasing a driver-employee to a trucking company client, TLC had no right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee. According to petitioner, each driver-employee was effectively assigned to only one trucking company client.

Respondent counters that the exclusive lease agreement gave TLC the right to lease a driver-employee to more than one trucking company client and thereby assign additional projects to such driver-employee.

We have found that while TLC was leasing a driver-employee to a trucking company client, TLC had the right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee. The parties agree that, once TLC assigned a driver-employee to a trucking company client, TLC did not reassign such driver-employee to another trucking company client without permission from the trucking company client to which TLC had assigned such driver-employee. Such a practice of TLC was, we believe, a sound business practice. TLC, like any business, was interested in accommodating, to the extent feasible, the requests of its

clients.[46]

On the record before us, we find that TLC's right to lease a driver-employee to a trucking company client while it was leasing such driver-employee to another trucking company client and thereby to assign additional projects to such driver-employee is a factor evidencing that TLC was the employer of each driver-employee.

## Employee Benefits For Each Driver-Employee

Petitioner does not address TLC's sponsorship of certain employee benefits with respect to which each driver-employee made payments through payroll deductions, including: (1) A section 401(k) plan; (2) a section 125 flexible benefit plan; and (3) group or individual health insurance.[47]

On the record before us, we find that TLC's sponsorship of certain employee benefit plans for the driver-employees is a factor evidencing that TLC was the employer of each driver-

---

[46]We note that TLC frequently was successful in reassigning a driver-employee from one trucking company client that no longer wished to use such driver-employee to another trucking company client. TLC also reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee.

[47]Certain trucking company clients paid at least part of the premiums associated with the health insurance plan that TLC sponsored for the driver-employees whom TLC leased to them. See supra note 13. TLC paid the premiums associated with the $5,000 group term life insurance policy provided for each driver-employee.

employee.

Authority To Determine Driver-Employee's Vacation

Petitioner argues that each trucking company client, and not TLC, had the authority to determine whether to permit a driver-employee whom TLC leased to such trucking company client to take any vacation days.

Respondent does not dispute that each trucking company client had such authority. Instead, respondent maintains that determining whether to permit a driver-employee to take vacation days "is, like dispatching, a function which must necessarily be performed by the Trucking Company and therefore has little bearing on which party is the employer."

On the record before us, we find that each trucking company client's authority to determine whether to permit a driver-employee whom TLC leased to it to take any vacation days is a factor evidencing that each trucking company client was the employer of each driver-employee.

Method of Payment

Petitioner argues that "It is clear that the source of the funds used to meet [TLC's] payroll obligations was from income earned by the Trucking Companies." That is because, according to petitioner, "TLC required the Trucking Companies to wire transfer the funds to TLC before TLC would issue payroll." Petitioner also points out that, in order to ensure that TLC had sufficient

funds to pay TLC's payroll obligation, the exclusive lease agreement required each trucking company client to pay a $650 deposit to TLC, an amount TLC intended to approximate TLC's payroll obligation for each driver-employee for one week.

Respondent counters that "the source of the funds used by the Trucking Companies to pay TLC" is irrelevant because "Solvent businesses necessarily pay recurring expenses out of income." According to respondent, what is relevant is that "there was no escrow or reimbursement arrangement, only the payment of a flat fee."

We have found that, for each payroll period with respect to each driver-employee, TLC was obligated to, and did, pay such driver-employee his or her net wages and any per diem amounts, regardless of whether the trucking company client to which TLC leased such driver-employee paid TLC the lease fee. We have also found that each payroll period each trucking company client paid TLC a lease fee that was not broken down into component parts, which TLC used to cover its costs and generate a profit. The method by which each trucking company client paid TLC the lease fee to compensate TLC for leasing driver-employees to such trucking company client is not a factor indicating that each trucking company client, and not TLC, was the employer of the driver-employees whom it leased from TLC. It is common business practice for a business to use moneys received from its clients

or customers as payments for services or goods in order to cover its expenses.

In order to ensure that TLC had sufficient funds to pay TLC's payroll obligation, each exclusive lease agreement required each trucking company client to make a $650 deposit per truck with TLC. The $650 deposit that each trucking company client paid to TLC did not ensure that TLC had sufficient funds to pay TLC's payroll obligation with respect to each driver-employee whom it leased to such trucking company client where (1) such trucking company client selected a payroll period that covered more than one week and/or (2) such driver-employee was entitled to a batch report lump sum amount that was greater than $650 per payroll period.

On the record before us, we find that the method by which each trucking company client paid TLC a lease fee to compensate TLC for leasing driver-employees to such trucking company client is a neutral factor in determining whether TLC is the employer of each driver-employee. On that record, we further find that TLC's payment of each driver-employee's net wages and any per diem amounts is a factor evidencing that TLC was the employer of each driver-employee.

Tax Treatment of Each Driver-Employee

Petitioner does not address TLC's tax treatment of each driver-employee. With respect to each driver-employee, for each

payroll period TLC was obligated to, and did, pay such driver-employee his or her net wages and any per diem amounts as well as the employer's share of employment taxes, withhold and pay the driver-employee's share of employment taxes, withhold and pay Federal and State income taxes, make daily electronic funds transfers of the appropriate amounts of such taxes to the IRS and appropriate State agencies, and pay workers' compensation insurance premiums.

On the record before us, we find that TLC's tax treatment of each driver-employee is a factor evidencing that TLC was the employer of such driver-employee.

Work of Driver-Employee as Part of Regular Business of TLC

Petitioner argues that each driver-employee was "an integral part of the regular business" of the trucking company client to which TLC leased such driver-employee and that each driver-employee played "no role in the daily function of TLC's business" of providing "back office functions such as payroll and benefits administration."

Respondent counters that, as reflected in the consolidated tax return (consolidated return) that petitioner filed for each of the taxable years at issue, the leasing of driver-employees was TLC's business, and the deduction that petitioner claimed for each of the taxable years at issue for TLC's expenses relating to the driver-employees was the largest deduction that petitioner

claimed in its consolidated return for each such taxable year.

We have found that each truck driver that TLC hired as a driver-employee played an integral role in TLC's business of leasing driver-employees to its trucking company clients. The exclusive lease agreement provided in pertinent part:

> Lessor [TLC] hereby leases to Lessee [trucking company client] those drivers in the employment of Lessor during the term of the Agreement. * * *

> *       *       *       *       *       *       *

> Lessor agrees to use its reasonable best efforts in furnishing Lessee with drivers as may be requested from Lessee from time to time during the term of this Agreement. * * *

The arrangement between TLC and each trucking company client was a driver-leasing arrangement, and not merely the provision of "back office functions". Each trucking company client could have conducted its trucking business by procuring the services of truck drivers to use in that business by hiring them directly and/or by leasing them from a person engaged in the driver-leasing business. TLC could not have conducted its business of leasing truck drivers without the driver-employees whom it leased to its trucking company clients.

On the record before us, we find that the integral role that each driver-employee played in TLC's business of leasing driver-employees to its trucking company clients is a factor evidencing that TLC was the employer of each driver-employee.

Duration of the Relationship Between a
Driver-Employee and a Trucking Company Client

Petitioner argues that "as between the Trucking Companies and their drivers, their relationship was of indefinite duration".  Petitioner points out:

> when a Trucking Company entered into a Lease Agreement with TLC, the existing drivers would continue to drive for the Trucking Company. * * * Moreover, upon cancellation of the Lease Agreement with TLC, the drivers typically would stay with the Trucking Company. * * * Many drivers have long-term relationships with the Trucking Companies that pre-date the Lease with TLC and continue after termination of the Lease Agreement. * * *

Respondent counters that "the duration of the relationship is a factor which is of little significance in determining which party was the employer."  Respondent points out that TLC frequently was successful in reassigning to another trucking company client a driver-employee whom a trucking company client did not wish to continue leasing from TLC.

Petitioner does not explain what it means when it argues that the "relationship" between a trucking company and its drivers was of indefinite duration.  We presume that petitioner means that after a trucking company entered into an exclusive lease agreement with TLC each driver who previously worked for such trucking company continued to perform services for such company pursuant to the arrangement with such company that existed before it entered into such lease agreement with TLC.  We reject any such argument.  We have found that, when each trucking

company entered into an exclusive lease agreement with TLC, such trucking company terminated the employment arrangement that it had with all of the truck drivers who previously worked for such trucking company.

In the instant case, it is the nature, and not the duration, of the relationship between a driver-employee and TLC and the relationship between a driver-employee and a trucking company client that determines whether TLC or such trucking company client is the employer of such driver-employee.

On the record before us, we find that TLC's leasing a driver-employee to a trucking company client for which such driver-employee had worked before such trucking company client entered into an exclusive lease agreement with TLC is a neutral factor in determining whether TLC was the employer of such driver-employee.

Termination of the Employment of a Driver-Employee

Petitioner contends that, without exception, the trucking company client made the decision to terminate the employment of any driver-employee whom TLC leased to it. Petitioner points out that each trucking company client was in the best position to evaluate each driver-employee's performance and therefore to decide whether to terminate the employment of a driver-employee.

Respondent counters that the exclusive lease agreement provided that TLC, and not each trucking company client, had the

sole and absolute authority to terminate the employment of each driver-employee.

We have found that TLC had the sole and absolute authority to terminate each driver-employee's employment with TLC. Petitioner's argument confuses a trucking company client's right to decline using a particular driver-employee whom TLC wanted to lease to it with the termination by TLC of such driver-employee's employment with TLC. Petitioner's argument also ignores that TLC frequently was successful in reassigning a driver-employee from one trucking company client to another trucking company client. That a trucking company client did not wish to use a particular driver-employee did not mean that TLC terminated such driver-employee's employment with TLC. TLC could have reassigned, and frequently did reassign, such a driver-employee to another trucking company client.

On the record before us, we find that TLC's sole and absolute authority to terminate each driver-employee's employment with TLC is a factor evidencing that TLC was the employer of each driver-employee.

Opportunity for Profit and Risk of Loss

Petitioner argues that TLC's opportunity for profit was "from its payroll and payroll-related services." Petitioner also points out that each exclusive lease agreement contained an indemnification provision (indemnification provision) which

provided in pertinent part:

> Lessor shall not be responsible or held liable for any injury or damage to person or property resulting from the use, misuse or failure of any equipment used by Lessee and utilized by Lessor's employees in the performance of its services to be provided herein. In this respect and in all other respects, Lessee shall indemnify Lessor against all liability or loss from and against all claims or actions based upon or arising out of damage or injury (including death) to persons or property caused by or sustained in the connection with the performance of the Agreement or by conditions created thereby or based upon any violation of any local, state or federal rule, regulation, ordinance or statute and the defense of any such claims or actions, except only as to injuries sustained by Lessor's employee, as a result of such employee's negligence or wrongful act of the employee.

> Lessor shall not be responsible for loss or damage to equipment or cargo of Lessee by reason of collision, fire, flood, windstorm, explosion, or other casualty.

> In this respect and in all other respects Lessee shall indemnify Lessor against all liabilities or losses, including but not limited to those liabilities or losses described immediately above.

Respondent counters that petitioner "fails to distinguish between losses incurred in the business of trucking and losses incurred in the business of leasing employees."

We turn first to the indemnification provision on which petitioner relies. We find that such indemnification provision may be read to support the respective positions of both parties in the instant case. The indemnification provision on which petitioner relies may be construed as implicitly acknowledging that, absent such provision, TLC, as the employer of each driver-employee whom it leased to a trucking company client, would have

been responsible, presumably under the doctrine of respondeat superior or a similar doctrine, for all liabilities and losses arising from the negligent and/or wrongful acts of such driver-employee. However, each trucking company client apparently received no consideration for its agreement under the indemnification provision on which petitioner relies to indemnify TLC for liabilities and losses arising from the negligent and/or wrongful acts of each driver-employee whom it leased from TLC, which may be construed as implicitly acknowledging that, at least with respect to such liabilities and losses, such trucking company client did not consider TLC to be the employer of such driver-employee.

We turn now to petitioner's argument that TLC's opportunity for profit was "from its payroll and payroll-related services." We reject petitioner's characterization of the services that TLC provided to its trucking company clients as payroll and payroll-related services. We have found that TLC was in the business of leasing driver-employees to trucking company clients. Nonetheless, we find merit in petitioner's suggestion that TLC's opportunity for profit from TLC's business was limited. That was because the amount of TLC's gross profit under an exclusive lease agreement with a trucking company client was not affected by any changes (e.g., increasing or decreasing the per diem percentage) in the factor used to compute the lease fee to which TLC was

entitled under such lease agreement.  The factor, although not broken down into component parts, was calculated to produce a lease fee that included, inter alia, a fixed amount for TLC's gross profit.  It is also noteworthy that TLC's risk of loss from its driver-leasing business was limited to the risk that it would have to pay TLC's payroll obligation with respect to each driver-employee for a payroll period, regardless of whether a trucking company client paid TLC the payroll period net lease fee due for such payroll period.[48]

On the record before us, we find that the indemnification provision on which petitioner relies, which we have found supports the respective positions of both parties in the instant case, is a neutral factor in determining whether TLC was the employer of each driver-employee.  On that record, we further find that TLC's limited opportunity for profit and limited risk of loss in its driver-leasing business is a factor evidencing that each trucking company client, and not TLC, was the employer of each driver-employee.

---

[48]Although each exclusive lease agreement required each trucking company client to make a $650 deposit with TLC, that deposit did not ensure that TLC had sufficient funds to pay TLC's payroll obligation with respect to each driver-employee whom it leased to such trucking company client where (1) such trucking company client selected a payroll period that covered more than one week and/or (2) such driver-employee was entitled to a batch report lump sum amount that was greater than $650 per payroll period.

Per Diem Letters

Petitioner argues that TLC's trucking company clients "were well aware of the total amount of per diem they paid and their responsibility to limit their deduction under Section 274(n)" because TLC sent each trucking company client a per diem letter for each of the taxable years at issue.

Respondent counters that TLC did not inform each trucking company client of the section 274(n)(1) limitation prior to such trucking company client's entering into the exclusive lease agreement with TLC.

We have found that the exclusive lease agreement was silent as to (1) any per diem amounts that TLC was to pay a driver-employee to cover such driver-employee's food and beverage expenses while traveling away from home and (2) the section 274(n)(1) limitation. We have also found that there were no agreements between TLC and any trucking company client regarding TLC's leasing driver-employees to such trucking company client other than the agreement set forth in the exclusive lease agreement. We view the per diem letters that TLC sent to its trucking company clients as nothing more than a self-serving attempt by TLC to bolster petitioner's position in the respective consolidated Forms 1120 that it filed for the taxable years at issue that the section 274(n)(1) limitation does not apply to the per diem amounts that TLC paid to its driver-employees. In this

regard, we note that at least certain of the trucking company clients to which TLC sent the per diem letters did not consider such letters to be binding on them, since such trucking company clients did not take the section 274(n)(1) limitation into account in their respective tax returns.[49]

On the record before us, we find that TLC's sending a per diem letter to each trucking company client is a neutral factor in determining whether TLC was the employer of each driver-employee.

Based on our examination of the entire record before us, we find that TLC was the employer of each driver-employee. On that record, we further find that the section 274(n)(1) limitation applies to the per diem amounts that TLC paid to its driver-employees.

We have considered all of the contentions and arguments of petitioner and respondent that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[49]The record establishes that TLC's trucking company clients NBS Trucking, Joe Hix Trucking, Blachowske Truck Line, Inc., Jones Brothers Trucking, Inc., Lake State Transport, Inc., Schak Trucking Inc., and Parkway Auto Transport received respective notices of deficiency in which respondent determined that they had failed to take into account the section 274(n)(1) limitation.

Appendix

TLC DRIVER HANDBOOK--TABLE OF CONTENTS

TRANSPORT LEASING/CONTRACT, INC.

GLOSSARY OF TERMS
INTRODUCTION
DRIVERS CREED
DISPATCH CALL-IN
GENERAL INFORMATION


GENERAL OPERATION

FUELING
PARKING
STARTING ENGINE
EQUIPMENT FAILURES ON ROAD
HOOKING UP TO TRAILER
DRIVING FOR MAXIMUM FUEL SAVINGS
BRAKING
MISCELLANEOUS
COLD WEATHER OPERATION
DEPARTURE TIMES
LOADING AND UNLOADING
     COUNTING
     WEIGHING YOUR LOADS
     SLIDING FIFTH WHEELS
     SLIDING THE TRAILER TANDEMS
     OVERAGES AND SHORTAGES
     LATE DELIVERY
     HAZARDOUS MATERIALS
     CLAIM PREVENTION


 OPERATIONS (VANS AND REEFERS [refrigerated trailers])

HOOKING UP TO TRAILER
REFRIGERATION UNIT OPERATION
TRAILER HEIGHT
COUNTING
SEALS
LOADING
UNLOADING
WEIGHING LOADS
FORKLIFTS
PALLETS
OVERAGES AND SHORTAGES
SEALS (FURTHER THOUGHT)

CLAIM PREVENTION
THERMOSTAT ON UNIT
RECOMMENDED PRODUCE PROCEDURES
HOW TO HANDLE DIFFERENT PRODUCE PRODUCTS
MISCELLANEOUS PRODUCE
ANY LOAD

## OPERATIONS (TANK TRAILERS)

LOADING AND MAKING A DELIVERY
SMOKING
SPILLS AND MIXES
IN THE EVENT OF A SPILL
IN THE EVENT OF A TOXIC SPILL
SPILL AND MIX REPORTING
RAILROAD CROSSINGS
USE OF SPECIAL EQUIPMENT
TRAILERS IN SHOP
SPEED WITH TANKS
PLACARDING

## OPERATIONS (FLATS & DROPS)

CARGO CLAIM PREVENTION
PRE-LOADING INSPECTIONS
LOADING
CHAINING
INSPECTIONS DURING TRIP
INSPECTION AT DELIVERY
TARPING
SHORTAGE
HIGH LOADS & OVERHEAD OBSTRUCTIONS
PERMIT LOADS - PRECAUTIONS
SPECIALIZED EQUIPMENT
LOAD TRANSFERRING (FORKLIFTS)
INTRODUCTIONS TO THE SAFETY SECTION
WHAT TO DO IN CASE OF AN ACCIDENT
MEETING OTHER VEHICLES
PASSING
BACKING
CLEARANCES
RAIL ROAD CROSSINGS
SPEED
TAILGATING
RIGHT OF WAY
STOPPING & PARKING
TURNS
TOP 10 DRIVING ERRORS

MIRRORS
FIRE PREVENTION AND FIRE FIGHTING
HAZARDS REQUIRING EXTRA PRECAUTION
WINTER DRIVING TIP
PERSONAL SAFETY TIPS
DEFENSIVE DRIVING
MOMENTUM

OTHER IMPORTANT TLC INFORMATION

PAYROLL
ADVANCES
PHONE CALLS
MOTELS
VALUABLES
UNAUTHORIZED PASSENGERS
ROUTES
PATIENCE
PROBATION
GENERAL CONDUCT
COMPENSATION

NOTE:  ALL REFERENCES TO "DISPATCH" IN THIS MANUAL ARE REFERENCES TO LESSEE DISPATCH.